**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JILL POWERS and PATRICK POWERS, Individually and on behalf of a class of consumers similarly situated, | ) ) ) | CASE NO: 1:09-cv-2059 |
| | ) | JUDGE WELLS |
| Plaintiffs, | ) ) | |
| vs. | ) ) | MAGISTRATE JUDGE VECCHIARELLI |
| FIFTH THIRD MORTGAGE CO., *et al.*, | ) ) | |
| Defendants. | ) ) ) | **REPORT AND RECOMMENDATION** Doc. No. 53 |

        This case is before the magistrate judge on referral.  Before the court is the

motion of plaintiffs, Jill and Patrick Powers ("the Powers"), for class certification

pursuant to Fed. R. Civ. P. 23 ("R. 23").  Doc. No. 53.  Defendants, Fifth Third Mortgage

Co. ("Fifth Third Mortgage"), Fifth Third Financial Corporation ("Fifth Third Financial"),

Fifth Third Bank (collectively, "Fifth Third"), and Vista Settlement Servs., LLC ("Vista"),

oppose plaintiffs' motion.  Doc. No. 59.  For the reasons given below, plaintiffs' motion

should be DENIED for the reasons that (1) whether RESPA applies to each putative

class member is a highly individualized question that cannot be determined by common

proof and (2) case-by-case determination of which of the 15,000 to 17,000 potential

class members are covered by the Real Estate Settlement Procedures Act, 12 U.S.C.

§§ 2601, *et seq.* ("RESPA"), would make the requested class action unmanageable.

I

Plaintiffs plead and support with admissible testimony or documents the following facts.  Defendants do not challenge these facts except where otherwise noted.

The Powers are residents of North Ridgeville, Ohio.  Fifth Third Mortgage is an Ohio corporation licensed in Ohio as a mortgage lender and doing business in Ohio and elsewhere.  Fifth Third Bank is an Ohio corporation.  Fifth Third Financial is an Ohio corporation that wholly owns Fifth Third Mortgage, Fifth Third Bank, and Visa.  Vista is a licensed title insurance agency that provides insurance and conducts other settlement services related to mortgage loans in Ohio and elsewhere.  This court has jurisdiction pursuant to federal question jurisdiction.  Title 28 U.S.C. § 1331.

Fifth Third Mortgage and Fifth Third Bank provide a substantial share of the residential mortgage loans in twelve midwestern and southern states.  As important lenders, they have a great deal of influence over selection of title insurance companies to perform settlement services associated with closing residential loans.

Title insurance companies perform a variety of services associated with mortgage loans, including title examinations, title searches, escrow services, deed and mortgage recordation, and the issuance of commitments and policies for title insurance.  Of these services, the most lucrative is providing title insurance.

Defendants jointly created a system to channel to Vista the title insurance services associated with the residential mortgages that Fifth Third Mortgage and Fifth Third Bank provided the Powers and other consumers.  Vista compiled a list of "approved" title companies that would receive all or substantially all of Fifth Third's settlement work.  To become an approved title company, an independent title company

2

had to agree to use Vista to issue the title insurance commitment, title insurance policy, and endorsements associated with the loan originating from Fifth Third Mortgage or Fifth Third Bank.  When a loan officer referred the title work to an independent title company, the referral included a directive to refer the title insurance work to Vista.[1]  This agreement stripped the lucrative title insurance business from the independent title companies, but it assured them a steady stream of income from the less lucrative services of title examination, title search, escrow, and deed and mortgage recordation. Vista thus acquired the lucrative title insurance services from the independent title companies without having to give those companies anything in exchange.  Vista then shared a portion of their fees for title insurance services with the officer originating the loan at Fifth Third Bank.[2]  Defendants regarded this so-called "Fast Cash" split with the originating loan officer as an employee incentive program.

Defendants made all disclosures associated with the activities described above and required by federal and state law as part of Fifth Third's "GLAD book."  This book was a compilation of disclosures required by various federal statutes.  It was Fifth Third's standard practice during the relevant period to give the book to borrowers face-

---

[1]  Defendants object that independent title agencies were not required to "choose" to refer title insurance business to Vista each time Fifth Third referred settlement work to the title agencies.  They also point out that not every referral by Fifth Third required the title agency to refer the title insurance business.  Defendants do not deny, however, that independent title insurance agencies became "preferred" by agreeing in advance to refer title insurance work to Vista when their referral from Fifth Third required them to do so.

[2]  Defendants object that although payments to loan officers pursuant to the Fast Cash program were measured as a percentage of Vista's fee, the actual payment came from Fifth Third in the form of a bonus.  The payment, defendants claim, did not come from Vista.

3

to-face or by mail.  A single version of the GLAD book was used at any one time.

Plaintiffs allege that the system described above violates RESPA in several respects.  First, plaintiffs contend that the "Fast Cash" payments to the loan originators are illegal kickbacks in violation of 12 U.S.C. § 2607(a) because they are made pursuant to an understanding that the payments will cause Vista to receive title insurance work.  Second, plaintiffs argue that the "Fast Cash" payments to the loan originators violate 12 U.S.C. § 2607(b) because they constitute illegal fee-splitting.  Third, according to plaintiffs, the title companies' giving title insurance work to Vista violates 12 U.S.C. § 2607(a) because it is a kickback by title companies in return for continuing to receive title work.  Fourth, plaintiffs contend that defendants failed properly to disclose the alleged kickbacks the title companies give in return for title business, thus failing to satisfy the requirements of RESPA's "safe harbor" provisions at 12 U.S.C. § 2607(c)(4)(A) and 24 C.F.R. 3500.7.

On March 24, 2009, the Powers refinanced their home at 8860 Belton Drive in North Ridgeville.  The Powers' mortgage originated with Fifth Third Mortgage.  The Fifth Third loan originator referred the closing and title business to Centennial Title, a Cleveland-area title agency.  Centennial Title was approved by Vista as a settlement services provider.  Pursuant to its agreement with Vista, it referred to Vista the policy commitment, title insurance policy, and endorsements portions of the mortgage closing.  In connection with these transactions, $541.40 was paid to Vista for its services, and another $967.00 paid to Centennial Title in connection with the Powers' loan.  Vista then directly or indirectly split its fee for performing these services with the loan officer who originated the Powers' loan.  The defendants did not disclose to the Powers the

4

affiliations between Vista and the other defendants.  Moreover, all RESPA-required disclosures were included in the GLAD book which the loan originator gave the Powers in his office.  No disclosures were given on a separate piece of paper requiring the borrowers' signatures.  The Powers allege that the loan and associated title insurance that defendants provided to them and other consumers violated RESPA.

Plaintiffs filed this action on September 3, 2009, alleging violations of 12 U.S.C. § 2607(a), (b), (c)(4)(A) and 24 C.F.R. 3500.7.  Plaintiffs now move to certify a class to include themselves and consumers similarly-situated with respect to defendants. Defendants oppose plaintiffs motion to certify the class.

## II.

RESPA prohibits kickbacks and unearned fees as part of, or incident to, a real estate settlement service involving a federally-related mortgage loan.  12 U.S.C. § 2607(a) ("2607(a)").  RESPA prohibits the referral of settlement service business for compensation, with the exception of those fees, salaries, and other compensation permitted by § 2607(c).  In addition to prohibiting payments for referrals and other real estate settlement services, RESPA also prohibits fee-splitting for such services:

> No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed.

12 U.S.C. 2607(b).  RESPA defines "settlement services" as "any service provided in connection with a real estate settlement" including, but not limited to, title searches, title insurance, attorney services, appraisals, credit reports, pest and fungus inspections, real estate agent or broker services, and loan processing.  12 U.S.C. § 2602(3).  The

5

Code of Federal Regulations defines "referral" as follows:

> A referral includes any oral or written action directed to a person which has the effect of affirmatively influencing the selection by any person of a provider of a settlement service or business incident to or part of a settlement service when such person will pay for such settlement service or business incident thereto or pay a charge attributable in whole or in part to such settlement service or business.

24 C.F.R. § 3500.14(f)(1).  Because RESPA is a remedial statue, it is construed broadly and its exceptions are construed narrowly.  *In re Carter*, 553 F.3d 979, 986 n.5, 986 (6th Cir. 2009).  Claims asserted pursuant to § 2607( a) must be brought within one year from the date the violation occurs.  12 U.S.C. § 2614.

A plaintiff asserting a cause of action pursuant to § 2607(a) must demonstrate each of the following:  "1) a payment or a thing of value; 2) made pursuant to an agreement to refer settlement business; and 3) an actual referral."  *Egerer v. Woodland Realty, Inc.*, 556 F.3d 415, 427 (6th Cir. 2009).  Defendants "who violate the prohibitions or limitations of this section shall be jointly and severally liable to the person or persons charged for the settlement service involved in the violation in an amount equal to three times the amount of any charge paid for such settlement service."  12 U.S.C. § 2607(d)(2).  Thus, damages include not merely three times the improper charge, but three times *all* charges for the settlement service.  *See Carter*, 553 F.3d at 985-7.

RESPA includes a "safe harbor" provision.  RESPA exempts payments made pursuant to an "affiliated business arrangement" provided those payments satisfy certain conditions.  An affiliated business entity is not liable under § 2607, where (1) it discloses the existence of the affiliated business arrangement; (2) it provides a written estimate of the charge or range of charges imposed by the affiliated business entity; (3)

6

it tells the person being referred that the person is not required to use any particular

provider of settlement services; and (4) the affiliated entities make no payments to each

other except a return on ownership interest or payments otherwise permitted under

RESPA.  § 2607(c)(4).  The written disclosure "must be provided on a separate piece of

paper no later than the time of each referral."  24 C.F.R. § 3500.15(b)(1).  Moreover, the

referring party must use the format set out in Appendix D of the regulations, including a

signature line indicating the referred party's receipt and understanding of the required

disclosures.  24 C.F.R. § 3500.15(b)(1).

 A disclosure that fails to meet the "strict technical" requirements of 24 C.F.R. §

3500.15(b)(1) and Appendix D may suffice to acquire the protections of § 2607(c)(4) if

the deviations do not impair the effectiveness of the disclosures and do not represent a

threat to the basic purpose of the "safe harbor" provision.  In *Vega v. First Fed. Sav. &

Loan Ass'n,* 622 F.2d 918, 925 (6th Cir. 1980), the Sixth Circuit found that a settlement

statement made pursuant to 24 C.F.R. § 82.6(b)(5)(A) did not deviate so far from

RESPA's required format as to be ineffective.  In *Vega*, the deviations consisted only of

deviations from the required system of capitalization.  Content, layout, and even type

size were otherwise consistent with the form prescribed by the regulations.  Moreover,

the changes were approved in advance by the Secretary of Housing and Urban

Development.  *See Vega*, 622 F.2d at 924-25, 925 n.6.  While the deviations in *Vega*

were found to be insignificant, the court warned against even technical deviations from

RESPA's requirements:

> In some cases, even technical changes in the uniform settlement statement
> represent a threat to the basic purposes of the statement.  Thus, even minor
> changes in the language of the uniform settlement statement would create

7

confusion and hinder the comparison of settlement costs by consumers. Changes in the format of the statement would generate similar difficulties. Moreover, significant changes in the type style might also prevent the meaningful disclosure of settlement costs to the consumer.  But the . . . changes in the capitalization of certain terms did not obfuscate any of the information contained in the settlement statement.  Under such circumstances, we do not believe that such changes constituted a violation of the Real Estate Settlement Procedures Act.

*Vega,* 622 F.2d at 924-25.  Although *Vega* addressed RESPA's requirements at 24

C.F.R. § 82.6(b)(5)(A) for settlement statements, rather than RESPA's format

requirements at 24 C.F.R. Pt. 3500 App. D for affiliated business disclosures, both

parties in this case look to *Vega* for general guidance regarding deviations from

RESPA's format requirements.

Plaintiffs allege that defendants (1) paid fees to loan officers in violation of §

2607(a); (2) paid kickbacks and split fees in violation of § 2607(a)&(b); without (3)

meeting the requirements of the "safe harbor" provisions of § 2607(c)(4).  Plaintiffs now

seek to certify a class of individuals allegedly injured by defendants in a similar manner.

III.

Class actions are used to achieve efficiency and economy of litigation.  *See*

*General Telephone Co. v. Falcon,* 457 U.S. 147, 159, 155 (1982).  A district court has

discretion to certify a class action within the boundaries set by Fed. R. Civ. P. 23 ("R.

23").  *Gulf Oil Co. v. Bernard,* 452 U.S. 89, 100 (1981).

The party moving for certification has the burden of establishing a right to class

certification.  *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 560 (6th Cir. 2007); *Alkire v.*

*Irving,* 330 F.3d 802, 820 (6th Cir. 2003).  A plaintiff must satisfy each of four

prerequisites to establish the right to class certification:

8

> 1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Rule. 23( a).  "[A]  class may only be certified if, 'after a rigorous analysis,' the district court is satisfied that these prerequisites have been met."  *Alkire*, 330 F.3d at 820 (quoting *Gen. Tel. Co. v. Falcon,* 457 U.S. 147, 161 (1982)).

In addition to satisfying the prerequisites of R. 23(a), a plaintiff must also demonstrate that the proposed class meets one of three sets of requirements at R. 23(b).  Plaintiffs move to certify the class pursuant to R. 23(b)(3), which provides that the court will certify a class if it finds the following:

> **(3)** the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:
>
>> **(A)** the class members' interests in individually controlling the prosecution or defense of separate actions;
>>
>> **(B)** the extent and nature of any litigation concerning the controversy already begun by or against class members;
>>
>> **(C)** the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>>
>> **(D)** the likely difficulties in managing a class action.

Plaintiffs must satisfy the requirements of both R. 23(a) and R. 23(b)(3) before the class may be certified.

"In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather

9

whether the requirements of Rule 23 are met." *Eisen v. Carlisle & Jacquelin,* 417 U.S.

156, 178 (1974) (citation omitted).  Indeed, R. 23 does not require or permit a district

court considering whether to certify a class to examine the merits of the plaintiff's suit.

*Beattie*, 511 F.3d at 560.  "[N]othing in either the language or history of Rule 23 . . .

gives a court any authority to conduct a preliminary inquiry into the merits of a suit in

order to determine whether it may be maintained as a class action." *Eisen,* 417 U.S. at

177.

> Plaintiffs define the proposed class as follows:

> All consumers who, from September 2, 2008 to the present, have at any time obtained a federally related mortgage loan originated by Fifth Third Mortgage Company where the HUD-1 Settlement Statement, or other document in the loan file, includes a charge for or payment to Vista Settlement Services.

Brief in Support of Plaintiffs' Motion, Motion, Exh. 1, p. 4.  Plaintiffs analyze this

proposed class definition as follows:

> This definition includes all persons who (a) obtained a loan covered by RESPA (*i.e.*, "federally related"); (b) that was primarily for personal purposes and thus not exempt from RESPA (*i.e.*, a "consumer"); (c) during the period beginning one year before the Complaint in this action was filed to the present (the "Class Period"), where (d) Vista received a payment. . . . This definition captures all consumers who were victimized by Defendants' unlawful kickbacks, fee-splitting, and non-compliant ABA disclosures because there is no dispute that Defendants implemented their scheme in a uniform, consistent manner as to all Vista customers.

Brief in Support at 5 (footnotes omitted).  Plaintiffs move to certify the class pursuant to

R. 23(a) & (b)(3).

IV.

In support of class certification, plaintiffs advance arguments asserting that they

meet the requirements of R. 23(a) & (b)(3).

10

A.     *Requirements of R. 23(a)*

Plaintiffs contend that the proposed class meets the numerosity, commonality, typicality, and adequacy requirements of R. 23(a).

   1.     *Numerosity*

Numerosity is satisfied if joinder of all plaintiffs would be impractical.  "There is no strict numerical test for determining impracticability of joinder."  *In re American Medical Systems, Inc.,* 75 F.3d 1069, 1079 (6th Cir. 1996).  "When class size reaches substantial proportions . . . the impracticability requirement is usually satisfied by the numbers alone."  *Id.*  "Substantial" numbers usually satisfy the numerosity requirement.  *Daffin v. Ford Motor Co.*, 458 F.3d 549, 552 (6th Cir. 2006) (finding numerosity satisfied when potential class members numbered in the thousands).

In the present case, plaintiffs contend that defendants' alleged misconduct "affected more than 22,000 borrowers annually . . . ."  Brief in Support at 3.  Plaintiffs support this contention with an interrogatory response that in 2008 Fifth Third ordered the referral of at least 22,000 deals to Vista.  *See id.* at 24.  According to plaintiffs, each borrower was injured in an amount ranging from a few hundred dollars to a few thousand dollars, making the alleged collective injuries ideal for a class action.  *Id.* at 3-4.  For these reasons, plaintiffs contend that the alleged class would be so numerous as to make joinder of all members impractical.  *See also id.* at 23-24.

   2.     *Commonality*

"Class relief "is 'peculiarly appropriate' when the 'issues involved are common to the class as a whole' and when they 'turn on questions of law applicable in the same manner to each member of the class.'"  *In re American Medical Systems*, 75 F.3d at

11

1081 (quoting *General Telephone v. Falcon*, 457 U.S. 147, 155 (1982).  Commonality

requires that all class members have at least one issue in common.  *Id.*  It also requires

that "[i]t is unlikely that differences in the factual background of each claim will affect the

outcome of the legal issue."  *Califano v. Yamasaki* 442 U.S. 682, 701 (1979) (affirming

class certification for litigation of an issue of interest to all social security beneficiaries).

Otherwise, variations in the circumstances of class members are acceptable.  *Bacon v.

Honda of America Mfg., Inc.*, 370 F.3d 565, 570 (6th Cir. 2004).  The "mere fact that

questions peculiar to each individual member of the class remain after the common

questions of the defendant's liability have been resolved does not dictate the conclusion

that a class action is impermissible."  *Sterling v. Velsicol Chem. Corp.,* 855 F.2d 1188,

1197 (6th Cir. 1988).

Plaintiffs assert that the proposed class satisfies the commonality requirement.

They allege that Fifth Third's policies, practices, and procedures during the relevant

period, including the agreement reached between defendants and "approved" title

companies to send title insurance work to Vista, the "Fast Cash" program, and Fifth

Third's GLAD disclosure book, were uniformly applied to all proposed class members.

This, according to plaintiffs, creates the following questions of law and fact common to

all members of the proposed class:

- Whether Fifth Third loan officers received illegal referral fees or kickbacks in respect of the mortgage loan transactions involving Vista;
- Whether the Defendants' "Fast Cash" program violates RESPA;
- Whether the Defendants split fees in connection with the origination of federally related mortgage loans in violation of RESPA;
- Whether Fifth Third Mortgage referred settlement services to title companies in exchange for the title companies' providing a "thing of value" to Vista in the form of title insurance business;

- Whether and how Vista's revenue was shared with its co-Defendants;
- Whether Vista is an "affiliated business arrangement" under RESPA; and
- Whether the Defendants adequately disclosed the affiliation between Vista and the other Defendants as required by law.

Brief in Support at 25.  These common issues, according to plaintiffs, satisfy Rule 23(a)'s commonality requirement.

>    *3.    Typicality*

The claims and defenses of the proposed class representative are typical if they arise "from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory."  *In re American Medical Systems, Inc.*, 75 F.3d 1079, 1082 (6th Cir. 1996).  Typicality exists where a "sufficient relationship exists between the injury to the named plaintiff and the conduct affecting the class, so that the court may properly attribute a collective nature to the challenged conduct."  *Sprague v. General Motors Corp.*, 133 F.3d 388, 399 (6th Cir. 1998) (quoting *In re American Medical Systems*, 75 F.3d at 1082.  "The premise of the typicality requirement is simply stated:  as goes the claim of the named plaintiff, so go the claims of the class."  *Sprague*, 133 F.3d at 399.  Typicality is not satisfied when a plaintiff can prove his own claim but not "necessarily have proved anybody's else's claim."  *Id.*  Finally, typicality is satisfied even if "a representative's claim [does] not always involve the same facts or law, provided there is a common element of fact or law."  *Senter v. Gen. Motors Corp.,* 532 F.2d 511, 525 n. 31 (6th Cir. 1976).

Plaintiffs contend that their claims and defenses are typical of those of the proposed class.  The plaintiffs offer admissible evidence to support that (1) the title work

for their refinance mortgage was referred by a Fifth Third loan officer to Centennial Title, a Vista-approved title company; (2) Centennial Title sent the title insurance business to Vista pursuant to an agreement it had with Vista; (3) Fifth Third processed their loan transaction using its standard documents and procedures; (4) they were given the disclosures required by RESPA in Fifth Third's standard GLAD book; and (5) they signed a single acknowledgment for having received and read the disclosures in the GLAD book. *See* Brief in support at 26-27, citing affidavits and depositions at Exhs. 2, 3a, 4, and 35. Plaintiffs contend that these facts make their claims typical of those of other class members.

>    4.    *Adequacy*

Generally, proposed lead plaintiff must meet two requirements under the adequacy prong of the four-part test at R. 23(a): "1) the representative must have common interests with unnamed members of the class, and 2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel." *In re Am. Med. Sys., Inc.,* 75 F.3d at 1083 (citations omitted). First, "[a] class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 562 (6th Cir. 2007) (quoting *Amchem Prod., Inc. v. Windsor,* 521 U.S. 591, 625-26 (1997)). Class members should not have interests that are antagonistic to one another. *Stout v. J.D. Byrider,* 228 F.3d 709, 717 (6th Cir. 2000). Second, a court must ascertain whether class counsel are qualified, experienced, and generally able to conduct the litigation. *Id.*

Plaintiffs also argue that they satisfy the adequacy requirement. According to

14

plaintiffs' depositions, "they are prepared to act as class representatives, to represent

the class for the purpose of testifying at trial and, if necessary, to participating in

discussions regarding class damages."  Brief in Support at 27-28 (citing deposition

testimony in Exhs. 36 and 37).  Plaintiffs assert that they have no interests antagonistic

to those of the class.  In addition, plaintiffs' counsel of record details his significant

experience in representing class actions and the experience of co-counsel in support of

their contention that they are qualified and experienced to represent the proposed class.

Declaration of Cyril V. Smith, Brief in Support, Exh. 38.

B.      *Requirements of R. 23(b)(3)*

        Plaintiffs also contend that the proposed class satisfies the requirements of R.

23(b)(3), *viz.* that common questions of law or fact predominate over individual issues

and a class action is superior to other methods for adjudication.

        1.      *Common questions of law or fact*

        In asserting that common questions of law or fact predominate over individual

issues, plaintiffs argue as follows:

> the issues surrounding Fifth Third's referral of title work to Vista-approved title
> companies, which in turn sent title insurance work to Vista, clearly predominate
> over any individualized issues.  Indeed, this kickback and fee-splitting scheme
> was created, implemented, controlled, and enforced entirely by Defendants on a
> uniform basis; no individual class member had any role in setting up these
> arrangements, and thus no individualized issues can possibly predominate.

Because of the uniform application to the class of procedures created by defendants,

plaintiffs contend that predominance of common questions of law and fact cannot be an

issue.

        Plaintiffs acknowledge that the various class members would have differing

15

damages.  They assert, however, that differing damage amounts, reflecting differing charges for title insurance and closing fees, are not a bar to class certification because the measure of damages pursuant to RESPA would be the same for all class members regardless of differing damage amounts.  *See Beattie*, 511 F.3d at 564 (finding that common questions may predominate when liability can be determined on a class-wide basis even if there are individualized damage issues); *and Carter*, 553 F.3d at 986 (finding that damages in RESPA action consists of treble payments made for settlement services, regardless of any overcharge).  Plaintiffs observe, that "a defense 'may arise and may affect different class members differently does not compel a finding that individual issues predominate over common ones.'"  *Beattie*, 511 F.3d at 564 (quoting *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124 (2nd Cir. 2001).

Finally, plaintiffs argue that differences in damages among class members would not significantly complicate the case or greatly distinguish class members from one another.  The amount of damages for each individual plaintiff would be, according to plaintiffs, a simple straightforward calculation based on the settlement fees charged each party.  Consequently, the necessity to calculate damages individually would not substantially affect the great number of commonalities of law and fact shared by class members.

For these reasons, plaintiffs contend that common questions of law or fact predominate over individual issues distinguishing class members.

2.      *A class action is superior to other methods of adjudication*

Rule 23(b)(3) specifies four factors to consider in determining whether a class action is superior to other methods of adjudication:  (a)  the class members' interests in

16

individually controlling the prosecution or defense of separate actions; (b) the extent and nature of any litigation concerning the controversy already begun by or against class members; (c) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (d) the likely difficulties in managing a class action.  Plaintiffs argue that all four factors enumerated by R. 23(b)(3) favor class certification in the present case.

> a.    The class members' interests in individually controlling the
>        prosecution or defense of separate actions

Plaintiffs point out that given the small dollar amounts of settlement fees involved in each mortgage loan closing, *viz.* a few hundred or a few thousands of dollars relative to the cost of litigation, potential class members have little motivation to litigate their claims individually.  For this reason, plaintiffs assert, the court in *Benway v. Resource Realty Services, LLC*, 239 F.R.D. 419, 426 (D. Md. 2006), stated, ""Rule 23(b)(3) actions are particularly well-suited for cases in which small individual recoveries would not provide plaintiffs with enough incentive to prosecute separate actions."

> b.    The extent and nature of any litigation concerning the controversy
>        already begun by or against class members

Plaintiffs note that only one case similar to the present one has been or is being adjudicated, *Toldy v. Fifth Third Mortg. Co.*, 721 F. Supp. 2d 696 (N.D. Ohio 2010) (Wells, J.).  Plaintiffs argue, however, that *Toldy* is distinguishable from the present case in several respects.  First, the plaintiffs in *Toldy* asserted theories of liability different from those in the present case, including the claims that Vista was a sham Affiliated Business Arrangement and that Fifth Third directly referred business to Vista rather than indirectly through independent title companies.  Second, the plaintiffs in

17

*Toldy* sought to recover only fees paid to Vista, whereas the present case seeks to recover all title-related fees.  Plaintiffs argue that the differences between these cases make them sufficiently distinguishable that the existence of both cases as class actions would not be a factor against certification.

        c.      *The desirability or undesirability of concentrating the litigation of the claims in the particular forum*

Plaintiffs contend that certification of this case as a R. 23(b)(3) class action is desirable in this Court because class treatment will serve the interests of judicial economy and efficiency; the small amount of damages recoverable in each individual case makes the prosecution of individual class member claims unlikely; and this court and counsel for all parties has substantial experience managing and litigating similar RESPA cases, such as *Toldy*.  Because this court and this district judge have adjudicated *Toldy*, plaintiffs assert, there is a possibility of judicial economy in adjudicating the present case in this court.

        d.      *The likely difficulties in managing a class action*

Finally, plaintiffs argue that there are no likely difficulties in managing this case as a class action.  Plaintiffs cite the depositions of James H. Artwell, Tammy Schaefer, and Andrew Ulrich for the assertions that the identities and addresses of class members; details of their loans; amount of closing fees; and characteristics of the mortgaged property are readily ascertainable from data maintained by defendants.  *See* Brief in Support at 30-31 and Exhs. 2, 7, & 20.  Because class members may be easily identified and contacted, plaintiffs contend, the proposed class would be easily managed based on information already available to defendants.

18

For all the reasons recited above, plaintiffs move to certify this case as a class action and provide admissible evidence to support for their contention that they satisfy each requirement for such certification pursuant to R. 23(a) & (b)(3).

C.    *Defendants' objections*

Defendants' objections to class certification are directed toward three requirements for certification pursuant to R. 23(a) & (b)(3):  (1) plaintiffs' claims do not satisfy the typicality requirement of R. 23(a)(3); (2) plaintiffs' claims do not satisfy R. 23(b)(3)'s predominance standard; and (3) treatment of plaintiffs' claims as a class action would create unmanageable difficulties.  Plaintiffs' respond that defendants' objections are irrelevant, factually contradicted by the record, misstate the relevant law, or are otherwise mistaken.

1.    *Plaintiffs' claims do not satisfy the typicality requirement of R. 23(a)(3)*

In support of their contention that plaintiffs' claims do not satisfy the typicality requirement of R. 23(a)(3), defendants argue as follows:

> For their claims to be typical, proof of the named plaintiffs claims must prove all the claims of the putative class. As the Sixth Circuit has stated, as goes the claim of the named plaintiff so go the claims of the class.  *Sprague*, 133 F.3d at 399. Accordingly, if the named plaintiffs cannot make a showing of liability on the basis of their own mortgage loan transaction, they are not sufficiently typical to satisfy Rule 23(a)(3).

Opposition at 38-39.

Defendants' statement of the law is erroneous in two respects.  First, as has already been described, plaintiffs are *not* required to share all claims with all members of the class.  Rather, typicality is satisfied even if "a representative's claim [does] not always involve the same facts or law, provided there is a common element of fact or

19

law." *Senter.,* 532 F.2d at 525 n.31.  It is only with respect to this shared common element of fact or law that *Sprague* stated, "as goes the claim of the named plaintiff, so go the claims of the class."  *Sprague*, 133 F.3d at 399.  Second, defendants wrongly conflate the likelihood of success on the merits with the desirability of certifying the class.  As stated earlier, "In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met."  *Eisen,* 417 U.S. at 178.  As these objections are legally erroneous, they are not well-taken.

Defendants also make two related arguments.  First, defendants raise the following objection:

> Plaintiffs assert that closing agents were required to refer business to Vista in order to get business from Fifth Third Mortgage, [sic] the record shows that Centennial was not required to use Vista in the Powers transaction.  Artwell Decl. ¶¶ 10-12.  Indeed, Centennial had the choice as to whether to accept the transaction or not; the decision to use Vista was made at the outset of the transaction and not by Centennial.  Garrity Dep. at 263-64; Artwell Decl. ¶ 10.

Defendants' Opposition at 39.  Defendants' arguments misstate plaintiffs' position. Plaintiffs do not allege that an independent title company decided to use Vista after a referral had been made.  They allege that an independent title company's decision to use Vista was made when the company decided to become an approved provider of title services to Fifth Third.  After agreeing to use Vista, plaintiffs' allege, each referral, indeed, directed the title services provider to refer the title insurance work to Vista. Defendants' assertion that "Centennial had the choice as to whether accept the transaction or not; the decision to use Vista was made at the outset of the transaction and not by Centennial" does not address the plaintiffs' claim.

20

Second, defendants point out that the Powers' claims are not typical insofar as the Powers' loan officer did not participate in the Fast Cash program.  The Powers concede that point, but they insist that this atypicality is insignificant compared to the great number of characteristics of their case typical of other class members:  (1) the title work for their refinance mortgage was referred by a Fifth Third loan officer to Centennial Title, a Vista-approved title company; (2) Centennial Title sent the title insurance business to Vista pursuant to an agreement it had with Vista; (3) Fifth Third processed their loan transaction using its standard documents and procedures; (4) they were given the disclosures required by RESPA in Fifth Third's standard GLAD book; and (5) they signed a single acknowledgment for having received and read the disclosures in the GLAD book.  The Powers' argument has substantial weight.

For the reasons given above, defendants' contention that plaintiffs' claims do not satisfy the typicality requirement of R. 23(a)(3) are not well taken.

2.      *Plaintiffs' claims do not satisfy R. 23(b)(3)'s predominance standard*

Defendants assert five contentions in support of their argument that plaintiffs' claims do not satisfy R. 23(b)(3)'s predominance standard:  (a) Vista has paid no dividends or retained earnings to its parent Fifth Third Financial; thus, plaintiffs cannot establish a class-wide § 2607(a) claim based on referrals between Fifth Third and Vista; (b) plaintiffs § 2607(a) & (b) claims based on the Fast Cash program do not satisfy R. 23(b)(3); (c) there is no class-wide evidence that an unlawful thing of value was paid to Vista based on purported referrals of Fifth Third's business to Vista by closing agents; (d) plaintiffs cannot prove the efficacy of defendants' disclosures on a class-wide basis; and (e) whether RESPA applies to each putative class member is a highly individualized

21

question that cannot be determined by common proof.

> *a.*    *Vista has paid no dividends or retained earnings to its parent Fifth Third Financial; thus, plaintiffs cannot establish a class-wide § 2607(a) claim based on referrals between Fifth Third and Vista*

Defendants argue that because Vista has paid no dividends or retained earnings to its parent Fifth Third Financial, plaintiffs cannot establish a class-wide § 2607(a) claim based on referrals between Fifth Third and Vista.  This argument is flawed in two respects.  First, it again mistakenly introduces the likelihood of success on the merits into consideration of whether a class should be certified.  Second, it is irrelevant because it misstates plaintiffs' case.  Plaintiffs' allege that Fifth Third gave referrals for closing work to independent title companies in exchange for a "thing of value," *i.e.*, the referral of all title insurance work to Vista.  Thus, defendants' argument is irrelevant because it does not address plaintiffs' actual allegations.

> *b.*    *Plaintiffs § 2607(a) & (b) claims based on the Fast Cash program do not satisfy R. 23(b)(3)*

Defendants also argue that because only 5% of the loans involving Vista included Fast Cash payments and because those payments did not violate RESPA, common questions of law or fact do not predominate over individual issues when plaintiffs' RESPA claims are considered class-wide.  With respect to the proportion of loans involving Fast Cash, as has already been observed, even if only a few of the loans involve payments made pursuant to the Fast Cash program, the other commonalities shared by proposed class members far outweigh this characteristic not shared by all class members.  Nevertheless, it is one factor to consider in determining whether uneven class participation in the Fast Cash program, in combination with other

22

differences between class members, prevent plaintiffs' claims from satisfying R.

23(b)(3)'s predominance standard.

Regarding whether the Fast Cash program is permitted by RESPA, that issue,

once again, mistakenly introduces the merits of the case into consideration of whether

to certify the class.  This objection is not well-taken.

> c.  *There is no class-wide evidence that an unlawful thing of value was paid to Vista based on purported referrals of Fifth Third's business to Vista by closing agents*

Defendants argue that plaintiffs fail to satisfy the predominance factor of R.

23(b)(3) because there is no class-wide evidence that an unlawful thing of value was

paid to Vista based on purported referrals of Fifth Third's business to Vista by closing

agents.  Defendants support this argument by asserting that (1) the decision to refer title

insurance business to Vista was made by the loan officer, not the individual

independent title company, and (2) because not every transaction involving an

independent title insurance company resulted in a referral of title insurance business to

Vista, it is impossible to prove that the independent title insurance referrals to Vista

were required to obtain Fifth Third's closing business.

Once again, defendants misstate plaintiffs' argument.  An assertion that a loan

officer, not the title company, made the decision whether the title company would refer

insurance work to Vista ignores plaintiffs' contention that the title insurance company

had to accept any such decision as a cost of doing business with Fifth Third.  And, once

again, defendants' argument that it is impossible to prove that the independent title

insurance referrals to Vista were required to obtain Fifth Third's closing business

improperly introduces consideration of the merits of the case into the decision as to

whether to certify the proposed class.

>    d.    *Plaintiffs cannot prove the efficacy of defendants' disclosures on a class-wide basis*

Defendants also argue that plaintiffs cannot prove the efficacy of defendants' disclosures as affiliated businesses on a class-wide basis.  According to defendants, the plaintiffs cannot show that defendants' required disclosures pursuant to RESPA failed to satisfy the safe harbor requirements of § 2607(c)(4)(A), 24 C.F.R. 3500.15, and 24 C.F.R. Pt. 3500, App. D. on a class-wide basis because the form of the disclosure varied from class member to class member.  This argument consists of two parts.  First, defendants note that the court in *Toldy* found that Fifth Third's disclosures that deviated from the technical requirements of § 2607(c)(4)(A), 24 C.F.R. 3500.15, and 24 C.F.R. Pt. 3500, App. D in certain *de minimis* ways, those disclosures might nevertheless satisfy the safe harbor requirements if they were efficacious.  Second, defendants add that certain loan officers supplemented in varying ways the written disclosures with oral disclosures, thus adding to the efficacy of the written disclosures.  As the written and oral variations differed from class member to class member, defendants contend that plaintiffs cannot prove on a class-wide basis whether the disclosures made were efficacious.

Defendants' arguments fail because they are based on the assumption that the measure of a proper disclosure pursuant to RESPA is whether the disclosure is effective.  But that is, for the most part, erroneous.  The safe harbor requirements of § 2607(c)(4)(A), 24 C.F.R. 3500.15, and 24 C.F.R. Pt. 3500, App. D are primarily a matter of *form*, not *effect*.  That is, a defendant asserting a safe harbor defense must

24

demonstrate that the defendant followed the proper procedures and format in making the required disclosures, not that the recipient of the disclosures actually understood them.  As already discussed, the safe harbor defense for affiliated business entities requires a defendant to (1) disclose the existence of the affiliated business arrangement; (2) provide a written estimate of the charge or range of charges imposed by the affiliated business entity; (3) tell the person being referred that the person is not required to use any particular provider of settlement services; and (4) the affiliated entities make no payments to each other except a return on ownership interest or payments otherwise permitted under RESPA.  § 2607(c)(4).  These disclosures must be *in writing* and "must be provided on a separate piece of paper no later than the time of each referral."  24 C.F.R. § 3500.15(b)(1).  In addition, the referring party must use the format set out in Appendix D of the regulations, including a signature line indicating the referred party's receipt and understanding of the required disclosures.  24 C.F.R. § 3500.15(b)(1).  If a defendant follows these requirements, then whether the plaintiff actually understood the disclosures is irrelevant.

The only time that plaintiffs' understanding of the required disclosures is an issue is when a defendants' written disclosures deviate *slightly* from the requirements of § 2607(c)(4)(A), 24 C.F.R. 3500.15, and 24 C.F.R. Pt. 3500, App. D.  If the disclosures fail to meet the "strict technical" requirements of 24 C.F.R. § 3500.15(b)(1) and Appendix D, the disclosures will only lose the protections of § 2607(c)(4) if the deviations impair the effectiveness of the disclosures and represent a threat to the basic purpose of the "safe harbor" provision.  *Vega,* 622 F.2d at 925.

Defendants' argument attempts to ground itself in the space opened by *Vega* for

slight deviations which are, despite their failure to follow the strict letter of the safe

harbor provisions, nevertheless effective.  Defendants' arguments are unavailing,

however.  In *Vega*, the deviations at issue consisted only of deviations from the required

system of capitalizations.  Content, layout, and even type size were otherwise

consistent with the form prescribed by the regulations, and the deviations were

approved in advance by the Secretary.  Moreover, the court in *Vega* specifically warned

that even technical changes represent a threat to the basic purposes of the statement.

In particular, the court warned that even minor changes in language and format would

create confusion, and even changes in type style might also prevent the meaningful

disclosure of settlement costs to the consumer.  In the present case, plaintiffs allege

that defendants uniformly failed to give the required affiliated business disclosures on a

separate piece of paper with a line on the paper for the recipient's signature.

Defendants' citation of *de minimis* variations in written disclosures are irrelevant to this

alleged fundamental violation of the safe harbor requirements.  There is no statute or

case that would permit such a flagrant violation of the safe harbor requirements to be

deemed merely a "technical violation" of 24 C.F.R. § 3500.15(b)(1) and Appendix D.

Consequently, the issue of whether these disclosures might, in some cases,

nevertheless have effectively conveyed the required warnings does not arise.  In

addition, as all disclosures are required to be in writing to trigger the safe harbor

provisions, whatever may have been said orally to the borrowers is entirely irrelevant.

Defendants' argument fails because it does not address RESPA's fundamentally *formal*

requirements for satisfying the safe harbor provision at issue.

       Plaintiffs allege that defendants' written disclosures to all class members

26

consisted of the disclosures in the GLAD book and were not made on a separate piece of paper with a line on the paper for the recipient's signature. They support these allegations with deposition testimony and documentary evidence. Brief in support at 14-15, citing Exhs. 2, 32a-b, 33, 34, and 35. These allegations are sufficient to satisfy R. 23(b)(3)'s predominance standard.

> e.     *Whether RESPA applies to each putative class member is a highly individualized question that cannot be determined by common proof*

Defendants argue that it is impossible to tell whether RESPA applies to each potential class member's claims without fact-intensive individualized hearings to determine each potential plaintiff's (1) primary purpose in acquiring the loan and (2) the total acreage of the property securing the loan. Defendants assert that such an inquiry is necessary because RESPA does not apply to loans made primarily for business, commercial, or agricultural purposes or on property of 25 acres or more. Consequently, because of uncertainty as to whether RESPA applies to potential class members, plaintiffs have failed to demonstrate that their RESPA allegations satisfy R. 23(b)(3)'s predominance standard.

Plaintiffs counter that this argument is without merit because RESPA applies to all loans secured by the borrower's primary residence and because defendants' records include sufficient information to determine whether any particular loan is secured by a primary residence. Plaintiffs assert that RESPA's "primary purpose" language incorporates a similar provision in the Truth in Lending Act ("TILA"). *See* 24 C.F.R. § 3500.5(b)(2) (defining RESPA's "business purpose loan" exemption by reference to TILA's Regulation Z); *see also Lind v. New Hope Property, LLC*, 2010 WL 1493003, at

*6 (D.N.J. 2010) ("There is virtually no case law interpreting the RESPA business purpose exemption . . . Persons may rely on Regulation Z in determining whether the [RESPA] exemption applies.").  TILA's Regulation Z generally covers loans secured by a primary residence and does not include loans secured by a primary residence within the "business purpose" exemption.  *See* 12 C.F.R. §§ 226.1(b); 226.2; 226.3; 226.5b; 226.19(a); 226.20; and 226, Supp. I, Official Staff interpretations, com. 226.3(3)(b)(1); *see also Antanuos v. First Nat. Bank of Arizona*, 508 F. Supp. 2d 466, 471 (E.D. Va. 2007) ("TILA applies only to credit transactions secured by real or personal property used or expected to be used as the principal dwelling of the debtor."); *Lind* , 2010 WL 1493003 at *6 (finding that the TILA and RESPA business exemption applies to rental property not occupied by the owner); and *Searles v. Clarion Mortg. Co.*, 1987 WL 61932, at *3 (E.D. Pa. 1987) (finding that the TILA business purpose exemption does not apply to a loan to buy property originally used as the family's residence). Consequently, plaintiffs conclude, RESPA applies to all loans by potential class members secured by a primary residence.

Plaintiffs' argument, however, merely proves that loans secured by a mortgage on real property or on the borrower's primary residence are the *only* loans covered by TILA, not that *all* such loans are covered by TILA and, by extension, RESPA.  The fact that a loan is secured by a primary residence does not inevitably mean that the loan is covered by TILA:  "[C]ourts faced with similar arrangements have been virtually unanimous in finding that the mere fact that the loan was secured by the family home does not itself bring the transaction under TILA.  *Sherlock v. Herdelin*, 2008 WL 732146, at *3 (E.D. Pa. March 17, 2008) (citing cases); *see also Mauro v. Countrywide Home*

28

*Loans, Inc.*, 727 F. Supp. 2d 145, 155 n.8, 154-55 (E.D.N.Y. 2010) ("[T]he fact that the properties securing the loans were rental properties is not dispositive on the question of plaintiff's purpose in obtaining the loan.") (discussing cases), and *Hinchliffe v. Option One Mortg. Corp.*, 2009 WL 1708007, at *4  (E.D. Pa. June 16, 2009) ("[I]n determining whether the loan qualifies for TILA [or] RESPA . . . protection, the focus is not on the nature of the property securing the loan, but on the use of the loan proceeds.").  Thus, to determine whether the purpose for the extension of credit was consumer- or business-related, and thus whether TILA applies to it, we examine the transaction as a whole and take into account "the entire surrounding factual circumstances."  *Sherlock*, 2008 WL 732146 at *3 (quoting *Gombosi v. Carteret Mortgage Corp.,* 894 F.Supp. 176, 180 (E.D. Pa. 1995)).

Title 12 C.F.R. 226.3(a)(1), supplementing TILA, provides as follows:

This regulation does not apply to the following:

a) Business, commercial, agricultural, or organizational credit.

> (1) An extension of credit primarily for a business, commercial or agricultural purpose.
> (2) An extension of credit to other than a natural person, including credit to government agencies or instrumentalities.

(b) Credit over $25,000 not secured by real property or a dwelling.  An extension of credit in which the amount financed exceeds $25,000 or in which there is an express written commitment to extend credit in excess of $25,000, unless the extension of credit is:

> (1) Secured by real property, or by personal property used or expected to be used as the principal dwelling of the consumer; or

> (2) A private education loan as defined in § 226.46(b)(5).

The plain language of the regulation, therefore, reveals that merely securing a loan with

real property or a primary residence does not necessarily bring a loan within the ambit of TILA or RESPA.  Even if a loan is secured by the borrower's primary residence, that loan is not covered by TILA or RESPA if most of the money borrowed is used for business, commercial, or agricultural purposes.  *Gombosi,* 894 F. Supp. at 180 ("Where credit is extended for both personal and business reasons, the mere fact that the transaction has *some* personal purpose does not automatically render it subject to the provisions of TILA.").  Moreover,  24 C.F.R. § 3500.5(b)(1) exempts from RESPA coverage loans secured by more than 25 acres of land.[3]

For these reasons, even if plaintiffs are correct in asserting that defendants' records may be used to determine whether the loans of potential class members were secured by real property or a primary residence, this is not sufficient to determine whether those loans are covered by RESPA.  The court must also know (1) if the proceeds from the loans were used primarily for purposes other than business, commerce, or agriculture; and (2) if the loan was secured by a mortgage on real property, whether that property was fewer than 25 acres.

Defendants' records describing the loan transactions of potential class members include, *inter alia*,  the following information for each loan:  the closing date; the loan purpose; whether the property will be owner occupied; the number and type of units, if any, on the property; whether a residence on the property will be the primary home or devoted to some other purpose; whether the borrower received cash back; the amount requested, the amount approved, and the total loan amount; the refinancing description;

_____

[3] Title 24 C.F.R. § 3500.5(b) also includes other exemptions that have not been raised as an issue in this case and are not applicable to the facts pleaded by the parties.

and "Hud line."[4]  Unnamed Excel file ("Excel file"), Reply, Exh. D.

Particularly relevant to the issue at hand are the loan purpose, whether the home will be owner occupied, whether the home will be the primary residence, the refinancing description, and whether the borrower received cash back.  Scans of 19,217 entries provided in the Excel file revealed that over 90% of the entries described the property at issue as owner occupied and a primary home; the remainder described the property as a second home or an investment property.  No more than half dozen were described as consisting of land only.  The entries for loan purpose largely consisted of "refi o/o" (owner occupied), "refi invest," and "refi SH" (for second home), with "refi o/o" or some variation consisting of well over 90% of the entires.  The refinancing description included such entries as "lwr rate," "rate and term refi," "refinance," "refi cash out," "cash out," "debt consolidation," "consolidate," and others.  Some form of refinancing was the most frequent entry, followed by taking cash out.  Roughly half of the loans were described as giving cash back to the borrower, although the entries did not list how much cash was involved.

It is impossible to tell from the descriptions in the Excel file whether many of the loans described in the file are covered by RESPA.  When the description notes an owner occupied, primary home with a loan purpose noted as refinancing, the fact that many such loans also resulted in an unknown amount of cash back to the borrower precludes the conclusion that purpose of the loan was for consumer purposes.  *See Hinchcliffe v. Option One Mort. Corp.*, 2009 WL 1708007 (E.D. Pa. June 16, 2009)

---

[4]  Neither party explains the meaning of "Hud line."

(finding that a loan was not covered by TILA or RESPA where, although the loan refinanced an alleged primary residence, the cash proceeds from the loan were used for business purposes).  Moreover, even when the Excel file lists a loan for the refinancing of an owner-occupied, primary home with out any cash back, the court cannot necessarily conclude that the loan is covered by RESPA.  In *Graham v. Manley Deas Kochalski, LLC*, 2009 WL 891743 (S.D. Ohio March 31, 2009),[5] the court discussed state cases applying, *inter alia*, the "original purpose test," looking to the purpose of the original loan to determine the purpose of a refinancing of that loan, and the "all circumstances test," in which determination of whether a loan is for consumer or business purposes requires consideration of all the circumstances surrounding the transactions.  Either of these tests may require a court to look to the purpose of the original loan when determining whether a refinancing of that loan is for a consumer or a business purpose.[6]  It is impossible to tell from the data in the Excel file whether, in cases of refinancing, whether it is appropriate for the court to look back to the original

---

[5]    *Graham* involved an application of the Fair Debt Collection Practices Act ("FDCPA"), not RESPA or TILA.  However, because of a paucity of caselaw elucidating the the FDCPA's requirement that a covered loan be for a consumer purpose, courts generally look to TILA caselaw examining a loan's purpose in interpreting the similar provision in the FDCPA.  *Graham* examined TILA and RESPA caselaw for this reason.

[6]  *Graham* suggests, for example, that where a refinancing results in a higher interest rate than the rate of the original loan, then the purpose for which the cash received from the refinancing was used weighs heavily in determining the purpose of the refinancing.  Where, however, the refinancing results in a lower rate than the original loan, then the purpose of the original loan and how the cash out from the refinancing, if any, is used must be considered in determining whether the refinancing was for a consumer or a business purpose.

loan or, when it is appropriate to do so, what the purpose of the original loan might be.[7]

About 10% of the 19,217 entries in the Excel file are clearly not covered by RESPA, including all loans secured by a second home or by investment property.  But about 80%-90% of the cases would have to be examined on an individual basis to determine whether they are covered by RESPA, including about 25-35% of the file consisting of loans secured by an owner-occupied, primary residence for the purpose of refinancing and without receiving cash back and about 55-65% of the file consisting of loans secured by an owner-occupied, primary residence for the purpose of refinancing and receiving cash.  This would amount to examining individually approximately 15,000 to 17,000 loans.

Courts asked to certify a class and faced with the problem of determining individually which loans are covered by RESPA have not usually concluded that this problem alone precludes class certification for failure to satisfy R. 23(b)(3)'s predominance standard.  Courts denying class certification and citing the need to determine which loans were covered by RESPA as a reason for the denial also cite additional differences between potential class members as contributing to the failure of predominance.  *See, e.g., Carter v. Welles-Bowen Realty, Inc.*, 2010 WL 908464  (N.D. Ohio March 11, 2010); *Pettrey v. Enterprise Title Agency, Inc.*., 241 F.R.D. 268 (N.D. Ohio 2006).

---

[7]  Additionally, defendant argue that the loan documents from which the information on the Excel spreadsheet is deduced is not conclusive evidence of the loan purpose, as this information may be completed by the borrower or the loan officer in a casual and unexamined manner.  Defendants further assert that they should be able to challenge the purpose of individual loans, which makes this issue unmanageable in a class action.

33

At least two courts have opined that a need to determine which loans are

covered by RESPA does not necessarily preclude class certification.  The court in

*Robinson v. Fountainhead Title Group Corp.*, 252 F.R.D. 275 (D. Md. 2008), found as

follows:

> The Court now turns to Fountainhead's argument that the determination of whether each class member's loan is "federally related" under RESPA would require individualized inquiry, destroying predominance under Rule 23(b)(3). . . .
>
> The only Court to fully address this issue concluded, albeit in *dicta,* that the issue of whether loans were "federally related" under RESPA would not destroy predominance.  *See Busby v. JRHBW Realty, Inc.,* Civ. No. 2:04-CV-2799-VEH, 2006 WL 5325733, at *12 (N.D. Ala. July 20, 2006), *aff'd in part, rev'd in part on other grounds,* 513 F.3d 1314 (11th Cir. 2008).  The *Busby* Court opined with respect to this issue that it was "confident that had this case been appropriate for a class action, the Court with the assistance of counsel could fashion an appropriate method to determine whether the individual loans were federally related without creating the need for individual analysis such that predominance would be [a]ffected."   *Id.*  This Court was similarly persuaded in the instant case by Plaintiff's assertion that, for the most part, information obtainable from Defendants' computer database would determine which loans were "federally related."  This is so because, as Fountainhead acknowledges, the database will reveal the name of the lender in each transaction and any residential loan involving a lender regulated by federal banking agencies is presumptively "federally related" under RESPA. . . . While Fountainhead is correct that the RESPA regulations provide certain exemptions that might be applicable to some loans, *see* 24 C.F.R. § 3500.5, the Court is not persuaded that these issues are significant enough to defeat predominance.
>
> The issue of liability-*i.e.,* whether Fountainhead violated section 8(a) of RESPA-is the core issue that may be resolved on a class-wide basis . . . Whether or not each class member is entitled to damages under RESPA may turn in part on a determination as to whether they have a "federally related" loan. As the Seventh Circuit Court of Appeals has noted, "[o]ften . . . there is a big difference from the standpoint of manageability between the liability and remedy phases of a class action."  *Carnegie v. Household Int'l, Inc.,* 376 F.3d 656, 661 (7th Cir. 2004); *see also Gunnells v. Healthplan Servs. Inc.,* 348 F.3d 417, 429 (4th Cir. 2003) (individualized inquiry into causation with respect to individual class members would not defeat predominance).  This is why Rule 23 "allows district courts to devise imaginative solutions to problems created by the presence in a class action litigation of individual damages issues."  *Id.*  This is precisely the type of issue that "imaginative solutions" should be able to resolve if

liability has been determined to exist.

*Robinson*, 252 F.R.D. at 293-94 (footnotes omitted).

The present case is distinguishable from *Busby* and *Robinson*, however, because the information maintained by defendants is insufficient to determine whether the vast majority of potential class members are covered by RESPA. Absent that information, the court faces a daunting task if the court were to certify the proposed class. Although it might be possible to resolve the issue of whether a particular loan involved the refinancing of a property consisting 25 acres or more without a great deal of difficulty,[8] the court cannot conceive of a simple method for determining whether any particular loan was for a consumer or business purpose, given the many factors involved in making that determination. Consequently, defendants' argument that whether RESPA applies to each putative class member is a highly individualized question that cannot be determined by common proof is well taken.

> 3.    *Treatment of plaintiffs' claims as a class action would create unmanageable difficulties without compensating advantages*

Finally, defendants argue that treatment of plaintiffs' claims as a class action would create difficulties impossible for the court to manage because the court would have to conduct innumerable "mini-trials." Morever, defendants claim, there would be no advantage to creating such difficulties because RESPA includes treble damages and attorney's fees to prevailing plaintiffs, thus eliminating the need for conducting RESPA cases as a class action.

---

[8] For example, participation in the class might be conditioned upon providing a copy of a deed or property description in the mortgage documents.

35

Defendants first contention, that class certification would require innumerable mini-trials to determine individually whether RESPA applies to each loan, has considerable weight, as described above.

Defendants' second contention, that RESPA's financial incentives make RESPA claims unsuitable for class proceedings, rests on persuasive authority alone.  While some district courts have agreed with defendants' position,[9] no circuit court has reached this conclusion.  Moreover, the majority of circuit courts have concluded, explicitly or implicitly, that RESPA claims are suitable for class actions.  *See, e.g., Tubbs v. North American Title Agency, Inc.*, 389 Fed. Appx. 104 (3d Cir. 2010); *Edwards v. The First American Corp.* 385 Fed. Appx. 629 (9th Cir. June 21, 2010); *Busby v. JRHBW Realty, Inc.*, 513 F.3d 1314 (11th Cir. 2008); *In re Community Bank of Northern Virginia*, 418 F.3d 277 (3d Cir. 2005); *Kruse v. Wells Fargo Home Mortg., Inc.*, 383 F.3d 49 (2d Cir. 2004); and *DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171 (8th Cir. 1995).

The Sixth Circuit has not ruled on the issue of whether RESPA's financial

---

[9]  These include two cases in this district, *Pettrey v. Enterprise Title Agency, Inc.*, 241 F.R.D. 268 (N.D. Ohio 2006) (Gaughan, J.), and *Carter v. Welles-Bowen Realty, Inc.*, 2010 WL 908464 (N.D. Ohio, March 11, 2010) (Zouhary, J.).  *Pettrey* gives the following rationale for finding individual suits to be preferable to class actions:

> Plaintiffs' claims that litigants lack financial incentives to bring their claims is simply wrong.  Under Section 8(d)(2) plaintiffs can recover their settlement fees and trebled damages.  Under Section 8(d)(5) they are entitled to costs and attorneys' fees.  In addition, HUD, "the Attorney General of any State, or the insurance commissioner of any State may bring an action to enjoin violations of" Section 8.  In light of the incentives for private actions and the possibility of government enforcement, Plaintiffs have failed to demonstrate that a class action is the superior method for resolving this dispute.

*Pettrey*, 241 F.R.D. at 284.  *Carter* repeats this argument. *See* 2010 WL 908464 at *2.

36

incentives make RESPA claims inappropriate for class actions. In *Coleman v. General Motors Acceptance Corp.*, 296 F.3d 443 (6th Cir. 2002), a case brought pursuant to the Equal Credit Opportunity Act, the court observed that "class treatment of claims is most appropriate where it is not "economically feasible" for individuals to pursue their own claims." 296 F.3d at 449. In a case involving alleged violations of TILA, however, the Sixth Circuit made the following observations:

> We are . . . aware that the technical nature of the violations may well argue in favor of the appropriateness of the class action here. Precisely because the violations are technical, as appellant notes, most of the members of the consumer class will not be aware of them unless they should encounter a practicing attorney versed in the Act. The superiority of the class action in these circumstances lies in the fact that the class members may share in a financial recovery which, otherwise, they would never pursue on their own behalf because of ignorance.

> Additionally, the class action provides an opportunity to educate a segment of the public, those included in the class, of the obligations which creditors owe to them as credit consumers. This mass awakening of awareness could, indeed, be the greatest single benefit derived in an area of regulation in which the responsibility of policing falls principally on the shoulders of the private citizen and private counsel.

*Watkins v. Simmons and Clark, Inc.*, 618 F.2d 398, 403-04 (6th Cir. 1980). As these observations apply with equal force to most RESPA cases, including the present case, it cannot be said that the Sixth Circuit has provided clear guidance on the issue of whether RESPA claims are suitable for class action.

Taken on balance, however, defendants' objections have considerable weight. If the court were to certify the class, it would have to determine on a case-by-case basis how many of about 15,000 to 17,000 loans in the Excel file are covered by RESPA. It is difficult to imagine how one of *Robinson's* "imaginative solutions" could make this task manageable. Absent any practical suggestion from plaintiffs as to how the court could

37

reasonably resolve this issue, class certification would create problems well beyond the court's resources to solve.

V.

For the reasons given above, plaintiffs' motion to certify a class should be DENIED.


Date:  August 12, 2011                    s/ Nancy A. Vecchiarelli____
                                          United States Magistrate Judge

**OBJECTIONS**

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.**  ***See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111.**